TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN








NO. 03-01-00686-CV






In the Interest of S. E. B.







FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT

NO. A-00-1139-AG, HONORABLE RAE LEIFESTE, JUDGE PRESIDING






 S.E.B. was born on April 12, 1997, to Crystal D. Barbero. On September 29, 2000,
the Attorney General of Texas filed a petition to determine whether Claude Eugene Bradshaw, III,
was S.E.B.'s father. Bradshaw initially denied that he was the father; after DNA testing showed that
Bradshaw was the father, he filed an amended answer acknowledging his paternity and asking the
district court, among other things, to change S.E.B.'s last name to Bradshaw and to render orders
related to child support. Bradshaw asked that retroactive child support be ordered only as of the date
paternity was established. The district court signed a final order finding that Bradshaw was S.E.B.'s
father, changing S.E.B.'s last name to Bradshaw, and ordering Bradshaw to pay $5,000 in retroactive
child support back to September 29, 2000. Barbero appeals, contending that the district court abused
its discretion in ordering the name change and in finding that Bradshaw first learned of his probable
paternity in September 2000, rather than in September 1996, when he was informed that Barbero was
pregnant. We will affirm.

Summary of the Evidence

 Bradshaw testified that in mid-August 1996, he and Barbero had a "one-night stand." 
Bradshaw saw Barbero about one month later, on about September 12 or 15, and she told him,
"Well, I'm two and a half or three and a half months pregnant." He further testified, "And I had this
look on my face like 'not good,' and she said: It's not yours; it's my old boyfriend's that I was living
with." When asked if she told him in September 1996 that either he or her ex-boyfriend, J.D.
Williams, could be the father, Bradshaw said, "She might have said that; I don't recall that." 
Bradshaw admitted that Barbero did not expressly exclude him as the father altogether. Shortly after
S.E.B. was born, Bradshaw saw a photograph and thought that S.E.B. did not resemble him in any
way; when he viewed the photograph, he was in a bar with dim lighting. Bradshaw also testified that
he went by Barbero's residence once after S.E.B. was born; S.E.B. was sleeping in a back room, and
Barbero refused to let Bradshaw see him.

 In 1996, Bradshaw discussed gestation periods with several people because, "I kind
of wanted some reassurance, because if it's possible I had a son out there, I would want to know
about it." He testified that Barbero told him "conflicting stories," and gave him a due date of March
15. Bradshaw believed that if the date of conception was on or about August 17, "the due date for
that child wouldn't have been March 15th; it would have been more like the middle of May, in to
the first of June, something like that, not March 15th." 

 Bradshaw also testified that in early 1999, Barbero's sister Laura Abernathy told him
that S.E.B. resembled him, and in August 1999, Barbero told him that Williams had been excluded
as S.E.B.'s father by a DNA test and that Bradshaw must be the father. Bradshaw said:


Whenever she called me and told me, I said: Okay. I'll come by and I'll see the boy
and we'll talk and we will see what we can work out. And I hung up and I got to
thinking. I said: You know, I've always wanted a son. I'm not going to get attached
to a little kid that I think is probably not mine. So I called her back up and I said: 
Look, if you got this other guy tested, you're bound to have some kind of paperwork
or proof that he got tested. Send me a copy of that paperwork and I'll be glad to do
something. She wrote down my phone number, my name and address and I never
heard a word from her.


When Barbero failed to send him the test results, he did not believe she was telling the truth. He
believed he was not the father "[b]ecause it was a one-night stand. She had told me he wasn't mine. 
She told me she was two and a half to three and a half months pregnant a month after we were
together."

 Bradshaw testified that no one ever approached him to take a paternity test and he did
not believe it was his responsibility to contact the Attorney General to arrange for testing. Bradshaw
thought it was Barbero's responsibility to show him Williams was not the father. He said, "If she
thought I was the father, she should have asked for help or she should have made sure I knew that
I was the dad." Bradshaw testified that if he had known he was the father when S.E.B. was born,
he would have sought full custody.

 Bradshaw said he did not know Barbero had a case with the Attorney General's
Office until October 2000, when Barbero told him that the Attorney General's Office was looking
for him. He immediately contacted the office and took a paternity test in December 2000. Bradshaw
testified that he began paying child support on the day he found out that he was the father, in January
2001. Bradshaw said he knew he was S.E.B.'s father in January 2001, when he got the test results. 
He thought he probably was the father in October 2000, when he learned of Barbero's case with the
Attorney General.

 Bradshaw said he wanted S.E.B.'s last name to be Bradshaw. He said "right now,
[S.E.B.] doesn't know his name in the first place. Most of the time he says it's Kennemer,[ (1)] and
his name is not Kennemer, never has been Kennemer. He should have a normal name like every
other kid in the United States and not have a hyphenated last name." He objected to S.E.B.'s name
remaining Barbero because he feared other children would be cruel and tease him when they found
out his father's name was not Barbero. He also did not want S.E.B.'s name to be hyphenated
because then S.E.B. would have to go through life explaining why he had two last names. 
Bradshaw's mother testified that S.E.B. says his last name is Kennemer.

 Williams's friend, Melissa Cahill, testified that, while pregnant, Barbero insisted that
Williams was the baby's father. Cahill testified that even after S.E.B. was born, Barbero showed her
photographs of S.E.B. and stated that he looked like Williams. She first learned that Bradshaw was
the father "a couple years" later, when Barbero said, "Oh, by the way, J.D.-my youngest turned out
not to be J.D.'s [Williams], and then she goes 'oops.'"

 Barbero testified that she had a one-night stand with Bradshaw on August 17, 1996. 
She found out she was pregnant with S.E.B. on September 7. She said at that time, she was not sure
whether the father was Bradshaw or Williams, with whom she last had sexual intercourse in early
July before their relationship ended in late July. Barbero testified that she notified Bradshaw of his
possible paternity on September 14; she denied telling him that she was already two and a half to
three months pregnant. Barbero said she saw Bradshaw frequently during her pregnancy and kept
him informed of due dates and other information given to her by her doctor. She testified that she
never told Bradshaw that he definitely was not the father or that Williams definitely was. About a
week after S.E.B. was born, she spoke to Bradshaw, who asked if the baby had been premature. She
informed him S.E.B. was not premature and had been carried for thirty-seven weeks. She testified
that she also told Bradshaw that she believed he was the father because the baby had a light
complexion and light hair, whereas Williams had very dark hair and a very dark complexion. When
S.E.B. was one or two months' old, she showed his photograph to Bradshaw and again told
Bradshaw the baby looked just like him; Bradshaw "didn't really make much of a response," and
"just kind of shrugged it off." When asked about the night Bradshaw came to her residence while
S.E.B. was asleep, she claimed that she "urged him to see him just so that he could look at him and
see what a resemblance there was," but Bradshaw declined to look at S.E.B.

 Barbero testified that on the same day she received written notification that DNA
testing excluded Williams as the biological father, she contacted Bradshaw to inform him that he was
the father. Bradshaw asked her to send him the information about Williams's test, but she did not
send the requested information because, "I felt that it was his responsibility. I had gone above and
beyond" by notifying him of his paternity and trying to get him to take some interest in S.E.B. 
Barbero stated that in September or October 2000 she advised Bradshaw that the Attorney General's
Office was looking for him.

 Barbero testified that in 1997 when S.E.B. was born, she believed Bradshaw was the
father. She did not name Bradshaw as the father on the birth certificate because she was not positive
he was the father, even though she "assumed, in [her] opinion" that he was. 

 In June 1998, Barbero applied for financial assistance with the Attorney General's
Office. In her application, she named Williams as the biological father, said she had "no idea" of
the date of conception, and said that when she told Williams she was pregnant, he replied, "Do you
need money to get rid of it?" The application asked whether she had a sexual relationship with
anyone else during the time frame of S.E.B.'s conception, and she named Bradshaw and listed his
partial address and phone number. She signed the form, declaring that "all information provided in
this form is true and correct." 

 Barbero testified that she named Williams on the assistance application because she
did not know Bradshaw's information and her caseworker said to "list the one that you know his
information." She testified that after a DNA test showed Williams could not be the father, she
attempted to re-apply naming Bradshaw as the father, but her application was rejected several times
because she "did not supply them with enough information" about Bradshaw. She said Williams
"was also actually a possibility. I am not a medical doctor. I have no way of knowing." She said,
"I thought it was [Bradshaw]. I filled it out on [Williams]." Although she "knew more information
about J.D. Williams," she was able to get Bradshaw's address and phone number from the telephone
book and she left several questions about Williams unanswered on the application, including his
address, phone number, driver's license information, birthplace, and parents' names and addresses.

 In March 2000, Barbero filled out a second application naming Bradshaw as S.E.B.'s
father; she provided his address, phone number, and a general physical description, but left most of
the other questions unanswered. She said she believed Bradshaw was the father because "my
boyfriend at the time failed the DNA test."

 Barbero testified that she has two sons, both of whom go by the last name of Barbero,
but said, "We do hyphenate Kennemer at times." Barbero asked the district court to leave S.E.B.'s
last name unchanged because "it's his name. Everything else in this baby's life has changed in the
past six months, and I don't think that changing his name - it's going to confuse him even worse." 
In the alternative, Barbero asked the court to hyphenate S.E.B.'s last name to Barbero-Bradshaw. 
Records from S.E.B.'s school files show that Barbero registered S.E.B. with the surname of
"Barbero-Kennemer" and also listed the hyphenated name as her last name.

 Laura Abernathy, Barbero's sister, testified that in October or November 1996,
Barbero informed her that she was pregnant and that the father was either Williams or Bradshaw. 
Barbero told Abernathy that Bradshaw claimed to have worn a condom, and that she "only slept with
him one night." After S.E.B. was born, Abernathy asked Bradshaw "if he had seen his son," and
Bradshaw replied that S.E.B. was not his child. Abernathy responded that S.E.B. looked like
Bradshaw, not Williams, but Bradshaw said he had to have proof before believing he was the father. 
Abernathy said she once showed him a photograph of S.E.B., and Bradshaw agreed that there was
a resemblance but said, "Crystal doesn't want anything to do with me and there's no proof that he's
mine."

 Joanie Hughes, Barbero's cousin, testified that she was present on the evening
Bradshaw came to Barbero's residence while S.E.B. slept in the back room. Hughes said Barbero
told Bradshaw that she had "pretty much narrowed down that he was the father and asked him if he
would like to go see him, if he wanted to look at the baby, because he was sleeping." Bradshaw did
not look at S.E.B. Jennifer Weidner, another of Barbero's cousins, testified that in March 2000, she
saw Bradshaw and asked if he knew about Williams's DNA test. He said that he did, and Weidner
asked, "So you know that you're [S.E.B.'s] father, and he said yes." Weidner said Bradshaw did not
seem interested in taking any initiative to confirm whether he was the father.


Discussion

 The district court issued findings of fact and conclusions of law, finding that
Bradshaw had knowledge of his paternity on or about September 29, 2000, and concluding that
retroactive child support began accruing on that date. The district court also concluded that it was
in S.E.B.'s best interest to have his last name changed to Bradshaw. In two issues, Barbero appeals,
contending (1) the district court abused its discretion in ordering S.E.B.'s last name changed, and
(2) the court erred in finding Bradshaw knew of his probable paternity on September 29, 2000, rather
than September 1996 or August 1999.

 We review a trial court's findings of fact under the same standards applied in a review
of a jury's verdict. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996); Anderson v. City of Seven
Points, 806 S.W.2d 791, 794 (Tex. 1991). We may not focus on the weakest evidence supporting
a judgment or choose to believe witnesses that the fact-finder found unpersuasive. Ortiz, 917
S.W.2d at 772.

 A trial court may order a child's name changed if the change is in the child's best
interest. Tex. Fam. Code Ann. § 45.004(a) (West 1996); G.K. v. K.A., 936 S.W.2d 70, 73 (Tex.
App.--Austin 1996, writ denied). A parent's interests and desires are of secondary importance. In
re Guthrie, 45 S.W.3d 719, 724 (Tex. App.--Dallas 2001, pet. denied); In re J.K., 922 S.W.2d 220,
222 (Tex. App.--San Antonio 1996, no writ). A trial court has wide discretion in deciding whether
it is in the child's best interest to grant a name change request. G.K., 936 S.W.2d at 73. A trial court
abuses its discretion if it acts unreasonably, arbitrarily, or without reference to guiding rules and
principles. Worford v. Stamper, 801 S.W.2d 108, 109 (Tex. 1990); Guthrie, 45 S.W.3d at 723. 
Generally, courts will change a child's name reluctantly and only when the child's welfare requires
it. Guthrie, 45 S.W.3d at 724.

 On appeal, Barbero urges that S.E.B.'s surname should remain unchanged because
the rest of his family unit has the name Barbero and a name change may confuse him and subject him
to humiliation in the future. She also contends that Bradshaw's "lack of involvement in [S.E.B.'s]
life before October 2000 and other misconduct" should weigh against changing S.E.B.'s name to his
father's name. At trial, Barbero testified that S.E.B. has been named Barbero all his life (2) and that
both of her sons currently have the same last name. Bradshaw testified that he believed that the
name change was in S.E.B.'s best interest because he feared S.E.B. would be teased if he had a
different name than his father and because he did not want his son to have to explain a hyphenated
name. He also said that S.E.B. does not have an understanding of his last name; according to
Bradshaw and his mother, S.E.B. usually states that his last name is Kennemer, not Barbero. 
Although Barbero contends that changing S.E.B.'s name will confuse him, she herself has informally
changed his name by hyphenating it with her current husband's name. Records from S.E.B.'s school
files show that Barbero has not listed S.E.B.'s name as Barbero, but instead as Barbero-Kennemer.

 We cannot hold on this record that the district court abused its discretion in ordering
the child's name change. See G.K., 936 S.W.2d at 73; see also Guthrie, 45 S.W.3d at 726 (no abuse
of discretion to change name where father reasoned that name change would show child's family ties
and heritage; mother's wish to keep child's name the same as hers weighed against name change but
did not overwhelm evidence in favor of change); J.K., 922 S.W.2d at 222-23 (abuse of discretion
to change child's last name from father's to mother's name because no evidence that keeping father's
name would harm child; father's concern about his own social issues is insufficient). We overrule
Barbero's first issue on appeal.

 When a trial court makes a determination of parentage, the court may order
retroactive child support. Tex. Fam. Code Ann. § 160.005(b) (West 1996). In ordering a father to
pay retroactive support, a trial court should consider the father's net resources during the relevant
time frame and whether the mother had attempted to notify the father of his probable paternity,
whether the father knew of his probable paternity, any undue financial hardship that could result
from the order, and whether the father provided support or other necessities before the paternity
action was filed. Id. § 154.131(b) (West Supp. 2002). A trial court has broad discretion in deciding
whether to order retroactive child support and, if so, in what amount. Guthrie, 45 S.W.3d at 727;
In re S.E.W., 960 S.W.2d 954, 956 (Tex. App.--Texarkana 1998, no pet.).

 Bradshaw and Barbero gave substantially conflicting testimony about Barbero's
attempts to notify Bradshaw of his probable paternity and about when Bradshaw knew of his
probable paternity. Bradshaw testified that Barbero informed him that he was not the father and that
Williams was the child's father, told him she was two and a half to three and a half months pregnant
one month after their sexual encounter, failed to send him the test results showing Williams was not
the father, and refused to let him see S.E.B. when he stopped by her residence. Bradshaw asserted
that as soon as he learned Barbero had filed a report alleging his paternity, he contacted the Attorney
General's Office. Barbero testified that she told Bradshaw that he might be the father immediately
after she learned she was pregnant. She denied telling him that she was further along in her
pregnancy than she actually was or that Williams was the father, and said Bradshaw refused to look
at S.E.B. when he was at her residence. Barbero's cousins testified that Bradshaw should have
suspected he was the father earlier than September 2000, but Cahill testified that during Barbero's
pregnancy and after S.E.B.'s birth, Barbero contended Williams was the father. In the 1998
application filed with the Attorney General, Barbero named Williams as the father and signed her
name, declaring that her allegations were true.

 We will not second-guess the trial court's determination of facts based on witness
credibility or demeanor. See McGalliard v. Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986); Schneider
v. Schneider, 5 S.W.3d 925, 931 (Tex. App.--Austin 1999, no pet.). Based on this evidence, we
cannot hold that the district court abused its discretion in finding that Bradshaw knew of his probable
paternity on or about September 29, 2000, and concluding that retroactive child support began
accruing on that date. We overrule Barbero's second issue. 

 We affirm the district court's order.



 __________________________________________

 Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Yeakel

Affirmed

Filed: May 31, 2002

Do Not Publish
1. Barbero is now married to Ronny Kennemer. Although she has not legally changed her
name from Barbero to Kennemer, the record shows that she, S.E.B., and her other son sometimes
go by the name Barbero-Kennemer.
2. S.E.B. was about four and one-quarter years' old at the time of the hearing.